Charles Goodman, et al. [1] v. Commissioner. Goodman v. Commissioner
Docket Nos. 14238, 14239, 14240, 18173, 18174, 18175, 20467.
United States Tax Court
1950 Tax Ct. Memo LEXIS 102; 9 T.C.M. (CCH) 789; T.C.M. (RIA) 50222; September 12, 1950
Herbert Klosk, Esq., for the petitioners in Docket Nos. 14238, 14239, 14240, 18173, 18174, 18175. Emanuel Becker, Esq., 165 Broadway, New York, N. Y., and Saul S. Freeman, C.P.A., 1450 Broadway, New York, N. Y., for the petitioner in Docket No. 20467. Conway N. Kitchen, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings were *103 consolidated for hearing and involve deficiencies in income taxes for the years 1943 and 1944 as follows: Docket
Petitioner
No.
Year
Deficiency
Charles Goodman
14238
1943
$17,234.13
Charles Goodman
18174
1944
13,603.87
Robert Goodman
14239
1943
388.48
Robert Goodman
18173
1944
8,700.29
Henry J. Jacoby
14240
1943
303.56
Henry J. Jacoby
18175
1944
7,513.63
George P. Wagner
20467
1943
29,443.52 The year 1942 is involved on account of the Current Tax Payment Act of 1943. A common issue raised by the petitions is whether each petitioner is taxable on his wife's, and in the case of Charles Goodman, also his daughter's, distributive share of the income of Wagner Co., an alleged partnership. Petitioner Wagner conceded at the hearing that his wife's share, including any gain realized from the sale of the interest in her name, was includible in his income. Other issues, in the cases of Charles Goodman and Henry J. Jacoby, relate to deductions for certain fees, medical and other expenses. The issues in the case of George P. Wagner are the amount of his taxable income from the partnership and capital loss sustained, or gain realized, upon *104 the disposition of his partnership interest. Petitioner Wagner is claiming a refund. Respondent asserted, under section 272 (e) of the Internal Revenue Code, increased deficiencies in the event this Court should decide that the distributive share of any of the petitioners out of the income of the partnership was greater than the amount determined by him in the deficiency notices. Excepting Wanger, who filed his return with the collector for the fourteenth district of New York, the petitioners filed their returns for the taxable years with the collector for the second district of New York. Findings of Fact Petitioner Wagner is an engineer with many years of experience in designing and building derricks and cranes. In October 1941 the Wanger Whirler Derrick Corporation, a corporation the stock of which was owned by Wanger, entered a bid with the Navy Department for the construction and erection of two whirler cranes at the Philadelphia Navy Yard. Thereafter, Wagner discussed with Charles Goodman the question of supplying capital for the work in the event his corporation was the successful bidder. Charles Goodman was very much interested in having members of *105 his family participate in the venture and agreed with Wagner that for a contribution of $10,000 for himself and a like contribution for each of three members of his family they should receive 55 per centum of the profits, the remainder to Wagner and his wife, provided they made a total capital contribution of $3,000. On about December 6, 1941, Wagner was notified that the bid of his corporation had been accepted. The contract entered into thereafter for the work will be referred to as the "2-crane contract." On December 9, 1941, Wagner and his wife, Jeanette Wanger, and Charles Goodman and Sylvia, his wife, Robert, a son, and Doris Goodman Jacoby, a daughter and wife of petitioner Henry J. Jacoby, executed an instrument for the formation of a limited partnership to design, fabricate and erect whirler cranes under the name of Wagner Company for a period of one year, unless terminated by consent of all of the parties thereto, with its principal place of business at 313 West 53rd Street, New York City. Charles and Robert Goodman and Wagner were specified in the instrument as general partners, entitled to 20, 15, and 25 per centum, respectively, of the net profits after deducting expenses, *106 including salaries, and Jeanette Wanger, Sylvia Goodman, hereinafter sometimes referred to as Sylvia, and Doris Goodman Jacoby, hereinafter at times referred to as Doris, as limited partners entitled to 20, 10 and 10 per centum, respectively, of the net profits. The contributions of Wagner and his wife were to consist of $1,500, each, and each of the other members was to contribute three bonds, face amount $1,000, each of the Associated Gas & Electric Corporation, 542 shares of preferred stock of the American Utilities Service Corporation, and $3,419.95 par value of scrip of the United Public Utilities Corporation of a total agreed value of $10,347.94. It was specified in the instrument that the prices set forth therein for the securities "* * * are at market or less on October 31, 1941 when proposed financial statement was sent to the U.S. Bureau of Yards and Docks." Provision was made in the agreement for the substitution by any member of the Goodman family, a party thereto, of cash for any or all of the securities, Wagner Co. not to sustain a loss or realize gain thereon, and for payment of dividends and interest on the securities to the individual in whose name the securities *107 were contributed. The instrument provided that checks on the bank account should be signed by Charles and Robert Goodman, or Robert Goodman and Wanger, with a right in each to designate an alternate to act during his absence or inability to sign checks. Losses sustained or incurred were to be borne in the same proportions as profits were distributable, provided, however, that no limited partner was to be liable for any loss in excess of her capital contribution or be personally liable for any debt or loss of the business. Upon dissolution, the assets, after payment of all liabilities, were to be distributed to limited and general partners in that order to the amount of their contributions, any excess to all of them in accordance with their shares in the profits. Books of account, open to inspection by the alleged partners, were to be kept and a quarterly statement therefrom mailed to each limited partner. The general partners were to "exercise full supervision and control of the design, fabrication and erection of the cranes aforementioned." Charles Goodman and Robert Goodman were assigned shares of the profits larger than the share to Sylvia and Doris on account of their experience *108 and ability to perform services for Wagner Co. The cash to be contributed by the Wagners was paid in December 1941. On December 11, 1941, capital accounts of Charles, Sylvia and Robert Goodman and Doris were each credited with $10,347.94 for contributions as follows: 3 $1,000 par value Associated Gas &
Electric Corp. bonds
$2,250.00
542 shares preferred stock Am. Utili-
ties Service Corp.
4,336.00
$3,419.95 par value United Public Utili-
ties Corp. scrip
3,761.94 The certificate for the stock contributed in the name of Doris was for 543 shares and the par value of the scrip contributed in her and Sylvia's name was $3,394.37, each. On December 15, 24, and 30, 1942, Sylvia and Doris executed instruments, separate from the certificate, for the assignment of the securities to Wagner Co. No assignments were made by them on the certificates for the bonds and scrip. The bonds and scrip were not reissued to Wagner Co. The securities contributed under terms of the agreement had been in the "family account" involved in Charles Goodman, et al., entered as a memorandum opinion on December 18, 1946 [5 TCM 1126,] appeal dismissed by stipulation June 19, 1950. They *109 were removed from the family account on November 13, 1941, for reissuance because of a question raised by agents of the Bureau of Internal Revenue as to the ownership thereof and for the purpose of using them for contributions to Wagner Co. Of the stock of American Utilities Service Corporation contributed in the name of Sylvia Goodman and Doris, 51 and 43 shares, respectively, were reissued out of a certificate outstanding in the name of Robert Goodman. Of the scrip contributed in the name of Sylvia, $500, par value, had been outstanding in her name since November 26, 1935, and $375, par value, of the contribution in the name of Doris had been in her name since December 3, 1935. The other securities contributed under their names had been outstanding in the name of Charles Goodman. The preferred stock of American Utilities Service Corporation was reissued on about December 23, 1941, pursuant to a request made by Charles Goodman on November 28, 1941. The Associated Gas and Electric Corporation bonds were reissued on December 29, 1941, and the scrip of the United Public Utilities Corporation on December 10, 1941. A certificate for the creation of a partnership under the name of Wagner *110 Company was filed in the Supreme Court, New York County, New York, and advertised for six successive weeks in December 1941, and January and February 1942, in two newspapers published in that county. A bank account was opened by Wanger Co. in December 1941 as a limited partnership against which the "general partners" were authorized to draw checks. One of the reasons Charles Goodman had for forming Wagner Co. pursuant to the terms of the agreement of December 9, 1941, was that it was the "best sort of tax-set-up." The dividends and interest paid on the securities contributed in the name of Doris were deposited in her bank account and used by her as she saw fit. None of it was given to her father. Wagner Co. did not at any time important have any activity other than to build whirler cranes for the Navy Department. The cranes weighed about 300 tons each and were made up of thousands of parts fabricated at various places and then shipped to a designated place for assembly under the supervision of Wanger Co. On February 11, 1942, Charles Goodman paid the amount of $10,347.94 to Wagner Co. for the securities which had been entered in the books as having been contributed in his *111 name. On November 25, 1942, Sylvia and Doris each issued a check in favor of Wagner Co. for $2,250 for the bonds of the Associated Gas & Electric Corporation which had been contributed in their names. Thereafter the bonds were sold by a broker and on about December 5, 1942, each received a check for $2,533.50 for the proceeds of the sales. The brokers' checks were deposited in their checking accounts on December 7, 1942. The checks issued by Sylvia and Doris on November 25, 1942, together with a check from Robert Goodman for the same amount for the bonds contributed in his name, were entered in the books of Wagner Co. and deposited on December 8, 1942. On December 5, 1942, Sylvia and Doris issued checks in favor of Wagner Co. for $4,336 and $4,344 for the 542 and 543 shares, respectively, of stock of the American Utilities Service Corporation which had been contributed in their names. On December 11, 1942, "Cash in Transit" was charged and "Investments" credited with $13,032 as a sale of the stock and 542 shares which had been contributed in the name of Robert Goodman. The stock in the names of Sylvia and Doris was delivered to a broker on December 8, 1942, for sale. The broker *112 sold the stock of Sylvia for $4,403.75 and of Doris for $4,411.88 and remitted the net proceeds to them on December 18, 1942, on which date the checks were deposited in their respective checking accounts, and the checks issued to Wagner Co. for the stock were deposited by the payee thereof. In February 1943, Sylvia and Robert Goodman and Doris each issued a check in favor of Wagner Co. for $3,733.81 for the scrip of the United Public Utilities Corporation which had been contributed in their names. The scrip was redeemed by the corporation in April 1943 at par, plus accrued interest, and Sylvia and Doris each received $4,811.52 for the scrip in their names. In their income tax returns for 1942 and 1943 Charles, Sylvia and Robert Goodman and Doris reported long-term capital gain in the total amount of $7,499.55, $7,027.68, $7,027.68 and $7,035.75, respectively, realized from sale and redemption of the securities. The gain reported was based upon cost as follows: American Utilities Service Corp.
1935 - 382 shares [1]
$ 633.00
1940 - 160 shares
1,109.00
$1,742.00
Associated Gas and Electric Corp.
1940 - 3 at $662.20
1,986.60 [2]
United Public Utilities Corp.
Nov. 13, 1941
898.97
*113 Wagner was an expert on cranes and machinery. He supervised the making of drawings for the cranes and consulted with the Navy Department concerning corrections made in and acceptance of the designs. His judgment was accepted as final by Robert and Charles Goodman on all technical details and he was regarded as the chief engineer of the business. Charles Goodman is a professional engineer but at the time Wagner Co. was formed had no experience designing and constructing cranes and machinery. He purchased material and negotiated subcontracts, at first under the direct and then under the general supervision of Wagner; gave Wagner such engineering skill as he possessed at the time it was needed; supervised the preparation of requests for payment under the Navy contract; made bank deposits, signed most of the checks; and, in general, supervised the administrative work in carrying out the contract. Robert Goodman, an engineer, assisted his father and rendered services in connection with the designing, fabrication and erection of cranes. In April 1942 the Navy Department advanced about $113,000 *114 to Wagner Co. on the 2-crane contract. The designs for the cranes were completed and construction work was started on the cranes in July 1942. Thereafter the work under the contract consisted of obtaining material for and erecting the cranes. The erection work was done under the supervision of Robert Goodman and Henry J. Jacoby. The contract was completed in February 1943. In September 1942 Wagner Co. received order No. 218 from the Navy Department for six whirler cranes at the total price of $615,000. In January 1943 and February 1944 orders for additional work increased the price $9,000 under each order. In February 1943 it received order No. 218-1018 Z from the Navy Department for ten whirler cranes at the total price of $1,040,000. Other orders increased the price to $1,123,118.40. The provisions in the orders for payment contain the following: "Progress payments monthly as material and/or labor is expended and certified by Inspector of Naval Material up to 90% of the contract price. Final 10% to be paid upon acceptance of Officer-in-Charge. * * *" The provision was inserted in the orders to provide a fund out of which to deduct damages for any default. No other orders, *115 of importance here, were received by Wagner Co. for the design or construction of cranes. Henry J. Jacoby, a chemical engineer and the husband of Doris, entered the employment of Wagner Co. in October 1942 at a salary of $65 a week, which was increased to $500 a month in 1943. At first he supervised production of parts at a plant in Yonkers and rendered some assistance to Wagner and Robert Goodman in plans for cranes, and later supervised or was in charge of the erection of the cranes. In 1944 Jacoby was paid a total of $3,753.98 for salary. In October 1942 the agreement executed on December 9, 1941, was amended to provide for the existence of the business for another year. A certificate for the amendment was filed with the clerk of the Supreme Court, New York County, New York, in December of that year. On November 23, 1943, on account of defects in design and material, the Navy Department had deducted $30,000 from the price of the two cranes, payment of which Wagner Co. never received, and was asserting so-called back charges for the same reason of about $9,200 on each of four cranes under the 6-crane order and it was expected that back charges would be made on the other two *116 cranes involved in that order and on the 10-crane order. A bill in the amount of $36,944 was received on December 14, 1943, for back charges on the four cranes. Wagner and Charles Goodman estimated that the back charges on the six cranes would amount to a total of $42,000, and on the ten cranes, $5,000 each. Wagner Co. recognized one of the two complaints made under the 6-crane order as serious but considered the other one to be exaggerated. All of the claims were satisfied by a payment of $5,000 about November 1944, and doing reconstruction work at a cost of about $15,000. On about November 23, 1943, Wagner consulted Charles Goodman about a sale of his and his wife's interest in Wagner Co. After some negotiation, Charles Goodman, without either party consulting the books of Wagner Co., proposed that the Wagners should receive from the formation of the business until the completion of the contracts, including necessary supervision, a total of $50,000, which proposal Wagner accepted. Each party had the advice of counsel in the negotiations. The services of Wagner were indispensable for successful operation of the business and, as a condition of the transaction, he agreed to render *117 services to Wagner Co. until the cranes were completed. Wagner and his wife, Charles Goodman, Henry J. Jacoby, Robert Goodman and Carolyn Goodman, the wife of Robert, executed an instrument bearing the date of November 23, 1943, reciting, among other things, that Wagner offered to sell two-fifths of his "share" of Wagner Co. to Charles Goodman for $3,000 and three-fifths thereof to Robert Goodman for $4,500; that Wagner "continue in the employ of the Wagner Co. for the duration of the work on the contracts aforementioned [total of 18 cranes, including maintenance on the two cranes at Philadelphia] for which he is to receive a salary as hereinafter described"; that Charles and Robert Goodman desired to purchase the shares at those prices; that Wagner had performed services for Wagner Co. during 1943 for which he was to receive $13,000; and that Jeanette Wagner had offered to sell to Henry J. Jacoby and Carolyn Goodman and that they desired to purchase from her one-half each of her share in Wagner Co. for $3,000. Charles Goodman and Robert Goodman agreed to purchase two-fifths and three-fifths of the share of Wagner in Wagner Co. for $3,000 and $4,500, respectively, and Henry J. *118 Jacoby and Carolyn Goodman each agreed to purchase one-half of the share of Jeanette Wagner in Wagner Co. for $3,000. Other terms of the agreement provided that Wagner was "to receive salary of $13,000 for services rendered to the Wagner Co. in 1943 * * *. Said salary is to be paid to George P. Wagner by December 15, 1943," and Wagner agreed to "remain as consulting engineer to the Wagner Co. in the design, fabrication, erection, supervision of erection and maintenance of the cranes" covered by the two contracts, for which he was to receive a salary of $11,500, payable on or before March 15, 1944, without any obligation to devote all of his time to such services, and for the indemnification by Charles and Robert Goodman of Wagner against any claim or demand against him arising out of the performance of the contracts prior to the date of the agreement. On the same day, the same parties and Sylvia and Doris executed an instrument further amending the agreement executed on December 9, 1941, to provide that Charles and Robert Goodman shall be the general partners and Carolyn and Sylvia Goodman, Henry J. Jacoby and his wife shall be the limited partners, Carolyn Goodman and Henry J. Jacoby *119 to contribute as capital the amount of $10,347.94 each; that the business was to terminate on December 9, 1944; that checks on the bank account of the business were to be signed by Charles and Robert Goodman, with a right in each to designate an alternate to sign checks during his absence or inability to sign checks; that the net profits of the business, after deducting expenses, including salaries, were to be divided, 30 per centum each to Charles and Robert Goodman, and 10 per centum to each of the other individuals; and that Charles and Robert Goodman should exercise full supervision and control of the design, fabrication, erection, supervision of erection and maintenance of the cranes. A certificate for the amendment to the contract executed as of November 23, 1943, was filed with the Supreme Court, New York County, New York, on December 9, 1943. The certificate recites that the amount of cash and the agreed value of other property contributed and to be contributed by Carolyn and Henry J. Jacoby was $10,347.94 each. Other amendments extended the existence of the agreement to December 9, 1948. Doris gave her husband a check for $3,000 for the purpose of acquiring the interest *120 of Jeanette Wagner in Wagner Co. The $3,000 paid by Carolyn Goodman was received as a gift from her husband for the purpose of making the payment. Carolyn and Jacoby did not contribute to Wagner Co. the cash or other property specified in the agreement executed on November 23, 1943, or any part thereof. The salary in the amount of $13,000 payable to Wagner on or before December 15, 1943, was paid on December 6, 1943, less $2,163.20 for withholding taxes. The entire amount, $13,000, was charged to "Payroll" as cost in performing the 10-crane contract, and was taken into account by Wagner Co. in computing profits of $108,335.69 in 1943 prior to November 23 and $8,962.01 thereafter, a total of $177,297.70. Salary totaling $9,200 was paid to Wagner in 1944, all of which was charged to "Payroll" as a cost in performing the 6-crane contract. After November 23, 1943, Robert Goodman became the chief engineer of Wagner Co. and Wagner served in the capacity of consulting engineer. Charles Goodman continued to attend to the administrative affairs of the business. Sylvia Goodman, Doris, and Carolyn Goodman did not at any time exercise any control over, participate in the management of, or *121 perform any personal services for Wagner Co. They frequently discussed with their respective husbands the affairs of Wagner Co. and at the end of each year they received a financial report of the business, which report they used for the preparation by each of income tax returns. Expenses incurred by Wagner Co. in carrying out the contracts were generally paid from 30 to 60 days before it received any payment therefor from the Navy Department. During the taxable years Wagner Co. borrowed money and repaid the loans with interest as follows: Lender
Paid
Aug. 13, 1942
Chemical Bank
$20,000
Oct. 18, 1943
$15,000
Nov. 17, 1942
Chemical Bank
10,000
Jan. 26, 1944
15,000
Dec. 18, 1942
Sylvia Goodman
30,000
Mar. 10, 1943
15,000
Mar. 23, 1943
5,000
Apr. 12, 1943
1,000
Apr. 22, 1943
1,000
Oct. 20, 1943
8,000
July. , 1943
Airhill Corp.
36,200
Oct. 8, 1943
36,200
Dec. 9, 1943
Sylvia Goodman
3,700
Jan. 28, 1944
3,700
Aug. 14, 1944
Charles Goodman
20,000
Aug. 31, 1944
20,000
The bank loans were made without collateral, at 3 1/2 per cent interest. Requests made by Wagner Co. on the Navy Department *122 for payments under the contracts were made about once a month on forms designated as "Progress Monthly Payments 90% of Contract Price." The basis for the requests was the percentage of work performed during the period for which each request was made, including an amount for overhead and profit. The bills for work and material were generally paid before making the request for payment. The price for the cranes under the 6-crane and 10-crane orders included for each crane $5,000 for engineering, $3,000 for supervision, and $15,000 for overhead and profit. As a request was made, the amount thereof, including retainage of 10 per centum, was entered in the books by a charge to the Navy Department and a credit to the account kept for the contract involved. The balance in the accounts kept for each contract was closed out to profit and loss as of the close of each year. The final request for payment under the 2-crane contract was made about September 6, 1943, and was disallowed about November 1, 1943. Requests for payment under the other contracts, including charges for extras and retainage (10 per cent to be withheld by the Navy Department until the contracts were completed), and payments *123 thereon in 1942 and prior to November 23 in 1943 were as follows: 6-crane
10-crane
Requests
Payment
Requests
Payment
1942
$ 43,750 [1]
$ 39,375
1943
588,446 [2]
520,632
$710,070
$574,200
Total
$632,196
$560,007
$710,070
$574,200 None of the payments included retainage. Four of the cranes under the 6-crane contract were completed and tested prior to November 23, 1943. Request for final payment on the completed cranes was made on November 8, 1943. A request for payment was made on that date on the basis that the 6-crane contract was fully completed except for one-third of the supervision. None of the cranes under the 10-crane order were completed prior to November 23, 1943. The first request for final payment on any of the cranes was made on March 31, 1944. The capital accounts of Wagner and his wife contained the following entries: Charges
Credits
Wagner
Wife
Wagner
Wife
Withdrawals 1943
$10,634.40
$ 2,400.00
Investment
$ 1,500.00
$ 1,500.00
Balance [1]
27,394.51
28,323.13
Profit 1942
9,444.99
7,555.99
Profit to Nov. 23, 1943
27,083.92
21,667.14
Total
$38,028.91
$30,723.13
Total
$38,028.91
$30,723.13
*124 Charles Goodman
$10,957.80
Henry J. Jacoby
$14,161.56
Robert Goodman
16,436.71
Carolyn Goodman
14,161.57
Total
$27,394.51
Total
$28,323.13 The capital accounts of Carolyn Goodman and Henry J. Jacoby contain no other credits for capital contributions. The capital accounts of Charles and Robert Goodman disclose the following withdrawals from Wagner Co. to the close of 1944: Charles
Robert
Goodman
Goodman
1943
$14,840.39 [1]
$16,551.38 [2]
1944
31,130.00
23,010.00
During the years 1943, 1944, 1945 and 1946, Sylvia Goodman received and expended amounts as follows: 1943
1944
1945
1946
Wagner Co.
$ 5,477.99 [1]
$5,650.00
$21,700.00
$ 7,545.68
Charles Goodman for household expenses [2]
9,050.00
8,730.85
8,400.00
9,350.00
Household expenses
10,209.63
9,335.05
8,259.37
8,262.89
Taxes
2,986.66
5,682.02
3,528.61
4,117.14
Investments
3,700.00 [3]
17,700.00
39,000.00
*125 During the years 1943 (after November 23), 1944, 1945 and 1946, Carolyn Goodman received and expended amounts as follows: 1943
1944
1945
1946
Wagner Co.
$1,000.00
$1,350.00
$21,600.00
$4,500.00
Robert Goodman
600.00
7,000.00
3,500.00
8,486.55
Household expenses
402.24
7,664.87
7,346.34
8,014.61
Taxes
1,000.00
1,013.44
2,483.26
109.33
Investments
17,700.00
7,000.00
During the years 1943, 1944, 1945 and 1946, Doris received and expended amounts as follows: 1943
1944
1945
1946
Wagner Co.
$4,277.99 [1]
$5,650.00
$21,600.00
$ 5,000.00
Household expenses [2]
5,024.65
7,035.06
Taxes
1,799.60
5,346.01
3,524.46
2,395.35
Investments
3,000.00 [3]
10,000.00
11,002.00 [4]
No part of the amount received from Wagner Co. was used to pay household expenses. The books of Wagner Co. were kept by members and employees of a firm of accountants. Entries were made about once a month *126 from invoices, check stubs, bank statements, requests made on the Navy Department for payment under the contracts and other papers. Complaints made by the Navy Department under the contracts were generally communicated to the accountants when they prepared their annual report and at that time they usually were given a letter by Charles Goodman on the subject. The accountants for Wagner Co. prepared a financial report in January 1944 from the books kept for the business showing profits for the calendar year 1943 in the amount of $117,297.70, of which $108,335.69 was shown as having been earned to and including November 23 and the remainder of $8,962.01 thereafter to the close of the year. The books disclose a loss during 1943 of $48,403.99 on the 2-crane order and profits of $50,356.68 and $115,971 on the 6-crane and 10-crane orders, respectively. In arriving at the profit in 1943, no amounts were accrued for "back charges" asserted by the Navy Department. The profits prior to and after November 23 were arrived at by deduction of the amounts of $28,722.40 and $730, respectively, for salaries. Wagner was not given a copy of the financial report. The returns of Wagner Co. for the *127 years 1942, 1943, and 1944 reported net income of $37,779.93, $117,297.70 and $118,725.94, respectively, distributable as follows: 1942
1943
1944
George P. Wagner
$ 9,444.99
$ 27,083.92
Charles Goodman
7,555.99
24,355.75
$ 35,617.77
Robert Goodman
5,666.98
18,938.95
35,617.77
Jeanette Wagner
7,555.99
21,667.14
Sylvia Goodman
3,777.99
11,729.77
11,872.60
Doris G. Jacoby
3,777.99
11,729.77
11,872.60
Henry J. Jacoby
896.20
11,872.60
Carolyn Goodman
896.20
11,872.60
Total
$37,779.93
$117,297.70
$118,725.94
The Goodmans and Jacobys each year, and Wagners in 1942, reported in their individual income tax returns the amounts shown above as distributive shares of the profits of Wagner Co. In 1943 Wagner reported as income from Wagner Co. the amount of $29,134.40, less $750 for his "original investment," net amount $28,384.40. In his determination of the deficiencies, the respondent made no adjustment in the amount of profits reported in the returns of Wagner Co. but held that the income was taxable as follows: 1942
1943
1944
George P. Wagner
$17,000.98 [1]
$ 48,751.06 [1]
Charles Goodman
15,111.97 [2]
46,919.09 [3]
$ 47,490.38 [1]
Robert Goodman
5,666.98
19,835.15 [4]
47,490.37 [1]
Henry J. Jacoby
1,792.40 [4]
23,745.19 [1]
Total
$37,779.93
$117,297.70
$118,725.94
*128 The respondent also included in the income of Wagner the amount of $13,000 as salary paid to him by Wagner Co. after he sold his interest and computed capital net losses totaling $42,217.64, on the sale of his and his wife's interest in Wagner Co. but limited the amount thereof for deduction purposes to $1,000. The basis in each instance was determined to be the sum of the original investment of $1,500, plus their share of distributable profits as reported in the returns filed by Wagner Co., less withdrawals. On January 6, 1942, Charles Goodman paid the amount of $250 to Seidman and Seidman for advice on questions involved in Charles Goodman, et al., supra. On January 4, 1943, and October 24, 1944, Charles Goodman paid to Wexler and Weisman the amounts of $100 and $129, respectively, for legal services rendered in a suit to recover bonds of the Hamilton Gas Co. which a committee, representing bondholders, was holding *129 pending payment by Goodman of fees for services. Goodman was contesting payment of the fees upon the ground that they were excessive. The suit was settled and Charles Goodman obtained his bonds by making a payment on October 10, 1944, of $380 to a bank which represented the bondholders' committee. In 1944 Charles Goodman paid a total of $30 as fees for filing petitions for the years 1938, 1940 and 1941, involved in Charles Goodman, et al., supra, and the amount of $4,650 for legal services in connection with the proceedings thereunder before this Court. In 1944 Charles Goodman made the following payments: New York City for occupancy of office
$ 1.00
The Municipal Engineers, City of New
York, for dues
5.00
Lorie Press for business stationery
43.43
Chase National Bank for photostats for
use in Charles Goodman, et al., supra
15.00
State Education Dept., N. Y., for license
to practice engineering
1.75
In 1944 Henry J. Jacoby paid the total amount of $1,432.87 to doctors and hospitals for medical services. Opinion The primary question here involves an enterprise in which two families were involved prior to November 23, 1943, and an enterprise thereafter *130 with new members to take the place of the retiring family. For the first period, respondent taxed Wagner on the profits reported by his wife, and Charles Goodman on the profits returned by his wife and daughter. After November 23, 1943, when Wagner and his wife ceased to be members of the business, and Jacoby and Carolyn, wife of Robert, became alleged limited partners, respondent taxed to each husband the share reported by his wife. The issue arose from the refusal of respondent to recognize Wagner Co. as a bona fide partnership for tax purposes. Petitioner Wagner conceded at the hearing that he was taxable on the earnings reported by his wife in 1943 but is contesting the amount of the earnings of the business. Thus, the family partnership question here is made unusual by an admission of one petitioner, a member of the business, of an ultimate fact which other interested members deny. The status of Wagner Co. as it existed prior to November 23, 1943, will be considered first. In Commissioner v. Culbertson, 337 U.S. 733, involving a general partnership, instead of, as here, an alleged limited partnership, the Court said: "* * * *131 The question is not whether the services or capital contributed by a partner are of sufficient importance to meet some objective standard supposedly established by the Tower case, but whether, considering all the facts - the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent - the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *" The object of the agreement of December 9, 1941, was to form a limited partnership under the laws of New York. Charles Goodman had tax advantages in mind when agreeing to that form of transacting business. Limited partnerships are a creature of statute, the primary object of which is to permit individuals having capital for investment to enter into partnership *132 with others having skill and experience without the limited partners incurring liability beyond the amount of their contributions of capital. Lanier v. Bowdoin, 282 N.Y. 32, 24 N.E. (2d) 732; White v. Eiseman, 134 N.Y. 101, 31 N.E. 276. Here Wagner possessed the skill and experience for successful operation of the business and interested Charles Goodman in supplying additional capital for the enterprise. It is conceded that none of the wives performed services for the enterprise. The concession is not fatal, for the statutes of New York prohibit the contribution of services by limited partners and a partnership, recognizable for tax purposes, may exist without a contribution of services. Art. 8, sec. 93, Partnership Law of New York, McKinney's Consolidated Laws of N. Y., Ann.; Commissioner v. Culbertson, supra; John A. Morris, 13 T.C. 1020. Petitioners, except Wagner, who is not interested in the question presently being considered (as to wives and daughters as partners), relying upon the Culbertson case as pointing the way to the answer here, argue that capital was a material income-producing factor in the business of Wagner *133 Co. and that Sylvia and Doris contributed original capital. They recognize that under Lucas v. Earl, 281 U.S. 111, income may be taxed to him who earns it. The principle is important here particularly in view of the prohibition in the state statute against rendition of services by limited partners. The evidence here establishes that while some capital was required to conduct the business, it was not the primary source of the income of the business. Until December 1942, when Doris, Robert and Sylvia substituted cash for the securities contributed in their names, Wagner Co. utilized only the capital contributions of the Wagners and Charles Goodman, amounting to about $13,000. Other operating costs were paid out of progress payments and other payments made by the Navy under the 2-crane contract and bank loans in the amount of $30,000 which were made in August and November 1942 without collateral. The first payment under the 2-crane contract was not made until April 1942, amounting to about $113,000, and no payments were made on the other contracts until December 28. Other loans in the amount of $66,200 were paid before November 23, 1943, including $15,000 on the bank loans. *134 During that period a total of about $30,000 was charged to capital accounts for withdrawals and thereafter in 1943 Doris, Charles and Sylvia received additional amounts totaling about $25,000. The withdrawals to the close of 1943, amounting to about 125 per centum of capital contributions, are contrary to any idea of great need for contributed capital for operating purposes. The individuals in whose names the securities were contributed had the right to substitute cash therefor at any time. Notwithstanding the alleged need for capital for business needs, only the securities contributed in the name of Charles Goodman were redeemed prior to December 1942. Obviously, if there had been any important necessity for usable capital all of the securities would have ben redeemed prior to that date. When Sylvia and Doris redeemed the bonds and stock, their checks were withheld from deposit until the securities were sold, procedure contrary to the idea of need of contributed capital. Under the circumstances, it is evident that the primary source of funds for operating expenses was the progress payments made by the Navy Department, which included amounts for overhead and profit. The Goodman *135 family admits that Wagner handled all of the engineering problems with such assistance as Charles and Robert Goodman could render. The importance of Wagner is shown by testimony of Charles Goodman that Wagner was an expert engineer in the construction of cranes, that he and his son, Robert, knew nothing about construction work on machinery, that Wagner not only supervised the drawing of all the designs for the cranes but also, with a few exceptions, no order for material was given, or sub-contracts for work let, without his approval, that as to technical matters the word of Wagner was final, and that it was necessary to have the services of Wagner even after November 23, 1943, by which time the Goodmans had acquired considerable experience in the business. During that time Charles Goodman looked after administrative matters and assisted Wagner to the extent of his ability. Robert assisted his father and Wagner in the performance of their duties. The importance of Wagner at the beginning is illustrated by testimony of Charles Goodman that "He was the whole show except that he did not have the money. We knew nothing about construction of machinery." Under the circumstances, it is apparent *136 that while some capital was required, the primary source of the income was the services of the general partners, particularly Wagner, who provided the first contract and all of the technical skill required to carry out the contracts. What was the source of the small amount of capital contributed to the venture? There was involved in Charles Goodman et al., supra, a so-called "family account," which Charles Goodman contended was a trust with himself and his wife and four children as beneficiaries. We held that no trust was created, that income from the property allegedly held in trust was taxable to him, and that the account was a fraudulent device to evade income taxes, including taxes for the year 1941. We found as a fact in that case the "family account" was closed on November 13, 1941, and concluded that the evidence did not establish that the securities in the account at that time were distributed to the beneficiaries. Petitioners admit that the securities contributed to Wagner Co. had been in the "family account" and the proof is that all of the securities contributed in the names of Sylvia and Doris were outstanding in the name of Charles Goodman, with the exception of 94 *137 shares of the stock and $875 par value of the scrip. There was a reissuance of the securities in December 1941 but no proof was made that Charles Goodman was not the owner of all the securities until the family account was closed. Thus, the evidence must be viewed in the light of ownership by Charles Goodman of the securities until at least November 13, 1941. It is contended that if Sylvia and Doris did not own the securities prior to November 13, 1941, they acquired them by gift on about that date to eliminate any doubt as to ownership prior thereto and not for the express purpose of contributing them to Wagner Co. The petitioners had the burden of proving the point. There is evidence here that the account was closed to eliminate doubt of the Bureau of Internal Revenue about the ownership of the securities. Such a purpose is not inconsistent with the idea that some of the securities were reissued for the express purpose of making contributions to Wagner in the names of Sylvia and Doris. There is evidence to support such a conclusion. Wagner's bid for the 2-crane contract was filed on some undisclosed day in October 1941 and thereafter, the date not appearing, he consulted Charles *138 Goodman about supplying capital for the work in the event the bid was accepted. Notice of the acceptance of his bid was received on December 6, 1941. Attached to the agreement of December 9, 1941, as a part thereof, is a statement that the prices set forth for the securities listed as contributions "are at market or less on Oct. 31, 1941 when proposed financial statement was sent to the U.S. Bureau of Yards and Docks." The notation discloses that representations were made to the Navy Department before the "family account" was closed that Wagner Co. when created would have capital of a specified amount. Nothing shown here is opposed to the idea that the Navy Department was advised that the securities specified in the instrument would be transferred to Wagner Co. as capital contributions. None of the securities were actually reissued until after December 9, 1941, and as a consequence Charles Goodman, as owner, had unfettered control over the securities until after the creation of Wagner Co. His control continued thereafter under the right he reserved to substitute cash for any of the securities at any time after their delivery to Wagner Co. Under the facts, we are unable to find from *139 the evidence that any capital was contributed by Sylvia or Doris. Where, as here, there is a lack of proof of contributions of capital, the effect is to place "a heavy burden on the taxpayer to show the bona fide intent of the parties to join together as partners." Commissioner v. Culbertson, supra. The statement of the Court is particularly applicable in this proceeding where services and not capital were the primary source of income, and such services were neither performed nor ever intended by the women. It seems reasonable that Charles Goodman and his son should be assigned shares of the profits greater than the interest assigned to Sylvia and Doris for a like contribution, for they were engineers and able to perform services for the enterprise. We search in vain, however, for any logical business reason for the parties to the instrument to assign to Jeanette Wagner, based upon a capital contribution of $1,500 cash a share of the profits equal to the combined shares of Sylvia and Doris for alleged contributions totaling about $20,700, and one-third greater than the share *140 of Robert, and the same as Charles, based upon services and a capital contribution of about seven times as much; and no such reason is suggested on brief. The business need for such an arrangement is weakened by the ability of the general partners to obtain bank loans at 3 1/2 per cent interest without collateral. The nature of the question here involved called for some explanation of the business need for an agreement to pay such an excessive rate of return on contributed capital; and none was given. Considerable reliance is placed upon the fact that the alleged limited partners used withdrawals as their own without any benefit to Charles Goodman. The use of profits withdrawn from an enterprise of the sort being considered here is a circumstance to be taken into account, but it is not controlling, as shown by statements of the Court in the Culbertson decision. The diversion of income for the exclusive use of the recipient may be part of a plan to place funds in the hands of others without tax consequences to the person who earned it. The true intent of the parties must govern the decision. *141 The parties here include the Wagners but we have not based our conclusion on the concession of Wagner that he is taxable on the income reported by his wife. Petitioners place great reliance on John A. Morris, supra. Each case of this sort turns upon its own facts and it would be unusual indeed if two cases contained identical material facts. It is sufficient to say that an examination of the facts in the Morris case discloses that they differ in material respects from the facts here. Considering all of the evidence in the light of the Culbertson case, we conclude that respondent committed no error in taxing to Charles Goodman the income reported by his wife and daughter for profits prior to November 23, 1943. On November 23, 1943, the interests of Charles Goodman and Robert Goodman were increased to 30 per centum each by the acquisition from Wagner of 10 and 15 per centum, respectively, of his quarter interest in the enterprise. At the same time Carolyn and Jacoby each acquired one-half of the interest outstanding in the name of Jeanette Wagner. The basic price in each instance was at the rate of $300 for a one per centum interest. The new interests continued throughout *142 the remainder of the taxable years involved herein. Respondent taxed to each husband the share of profits credited to his wife. Such action had the result of transferring the profits allocated to Doris from Charles Goodman to her husband, Henry J. Jacoby. The status of Sylvia was not in any manner altered by the rearrangement of interest upon the retirement of the Wagners from the business. Concerning the interest of Carolyn Goodman, petitioners assert that it was not taxable to her husband Robert, upon the ground that his interest was not diminished, instead was increased by a purchase of two-thirds of the share of Wagner. It is contended that the action of respondent in taxing to Henry J. Jacoby the share of Doris, which had been taxed to Charles Goodman, does not involve a partnership matter. Little need be said concerning the taxation to Charles Goodman of the profits reported by his wife. She was not a party to the transaction with the Wagners and the deal did not alter her purported interest in the profits. The factual basis of her right to profits for taxation purposes was not changed in any material way by the transaction entered into with the Wagners. The lack of bona *143 fides as to the transactions of Carolyn and Jacoby is apparent. Negotiations for the acquisition of the interests of the Wagners were between Wagner and Charles Goodman, in which an understanding was reached that Wagner would receive the amount of $50,000 for the interests outstanding in his and his wife's name, less withdrawals and including salary to the completion of the contracts. The understanding thus reached was made effective by an agreement providing for a total of $13,500 for the shares outstanding in the name of the Wagners, $13,000 for salary for 1943, and $11,500 as additional salary for services to be rendered in carrying out the 6-crane and 10-crane contracts. The $13,500 was paid by the alleged purchasers. The salary for 1943 was paid on December 6, 1943, and additional salary in the amount of $9,200 was paid in 1944, in each instance by Wagner Co. and charged as pay roll expense in completing the 10-crane and 6-crane contracts, respectively. The amounts agreed to be paid in the contract, plus withdrawals by the Wagners, approximate the amount of $50,000 agreed upon between Charles Goodman and Wagner. However, it does not appear how the parties arrived at the price *144 of $13,500 for the shares of the Wagners. The salary did not, of course, constitute any part of the shares of the Wagners in the business. The credit balance in the capital account of Wagner after an entry as of December 31, 1943, for profits to November 23, 1943, was credited to the capital accounts of Charles and Robert Goodman and the balance in the account of Jeanette Wagner was transferred to capital accounts in the names of Carolyn and Jacoby. The transfers in each instance were in accordance with the percentage of interest acquired and resulted in disproportionate credits for the respective interests. For instance, Carolyn and Jacoby each were credited with about $14,000 against a credit of $11,000 to Charles Goodman even though each acquired a like interest. Robert Goodman having acquired two-thirds of Wagner's interest received a credit of about $16,400. The manner in which the balances in the accounts were transferred is significant in view of the fact that the parties were dealing with the Wagners as a unit. Except to the extent of the alleged capital contribution of $1,500 by each of the Wagners, the credits to the capital account constituted distributable profits and *145 not capital contributions. The instrument executed as of November 23, 1943, for the admission of Carolyn and Jacoby as limited partners provided for a capital contribution by each of $10,347.94, an amount equal to the capital contributions originally made in the names of the other members. The certificate of amendment of the original agreement required by the laws of New York specified that such a contribution, or the agreed value of property contributed, would be of that amount. The agreement provided for a limitation of liability of limited partners to the amount of $10,347.94 contributed as capital but neither Carolyn nor Jacoby ever made such capital contribution. Section 105 of the Partnership Law of New York, 38 McKinney's Consolidated Laws of N. Y., Ann., 149, provides that capital contributions of a limited partnership may not be withdrawn or reduced until, among other things, liabilities, with some exceptions as to general partners, and contributions of limited partners, have been paid, the consent of all of the members has been obtained and the certificate is canceled or withdrawn. *146 Here the credit balance in the capital account of Carolyn had been reduced by withdrawals to $5,790.66 by the close of 1945. The credit balance in the account of Jacoby at the close of 1946 was only $4,777.89. In the absence of any proof of compliance with the state statute, the withdrawals made by these alleged limited partners are inconsistent with the idea that they and others designated as members of the business regarded the credits made from balances in the capital accounts of the Wagners as capital contributions. Aside from these observations neither Jacoby nor Carolyn supplied the cash for acquiring the interest outstanding in the name of Jeanette Wagner. Carolyn received her money from Robert and Jacoby from his wife Doris and, in each instance, for the express purpose of purchasing the shares. None of that money ever reached the treasury of Wagner Co. Durwood v. Commissioner, 159 Fed. (2d) 400; S. Kenneth Alexander, 6 T.C. 804; and Sinne B. Forsythe, 10 T.C. 417, are cited by the petitioners as supporting the proposition that original or donated capital is immaterial where the interest of the wife did not reduce, as here, the *147 share of the husband. In the Durwood case there was no capital contribution by or for the wife and children. In the Alexander case the wife purchased the interest with her own money and the proceeds of a loan made on a bank. In the Forsythe case a joint note of the husband and wife, secured by the property purchased, was given and the note was subsequently paid by the wife. The same factual situation does not prevail here. Other evidence of the lack of bona fides of the alleged partnership is shown by withdrawals. Charles and Robert Goodman, each with a record interest of 30 per centum, received as distributions the amount of $31,130 and $23,010, respectively, against $565 and $1,350 distributed to their respective wives, each of whom was credited with an interest of 10 per centum. Doris received $565 during the same year, whereas her husband allegedly having a like interest was not charged with any withdrawals but was paid about $3,800 as salary. Under all the circumstances it is clear that the evidence supports the action of respondent in taxing to Robert the income reported by his wife as a limited partner. Concerning the income reported by Doris, its source was the original *148 contribution made by Charles Goodman. None of it can be attributed to services or an investment of her husband. The only issue before us, as to the 20 per cent charged to Jacoby, concerns the 10 per cent reported by his wife. Accordingly, we find from consideration of all of the evidence, in the light of the Culbertson case, that for the period after November 23, 1943, Charles Goodman is taxable on the income reported by Sylvia and Doris; that the respondent properly taxed to Robert the profits reported by his wife, and that the respondent erred in including in the income of Jacoby the profits reported by Doris. In coming to our conclusions on this question, both as to the period ending November 23, 1943, and the period thereafter, we have not applied any objective test, but have, from all of the facts, concluded that there was no bona fide intent and business purpose that the wives (including Doris, the daughter of Charles Goodman) be joined as partners in the conduct of the enterprise, either because of services to be performed or because of contribution of capital of which they were the true owners, all within the requirements of the Culbertson case. Petitioners contend that *149 we are without authority to increase any of the deficiencies as will result from including in the income of Charles Goodman the income reported by Doris for profits earned after November 23, 1943. At the conclusion of the hearing respondent asserted as a protective measure, pursuant to the provisions of section 272(e), Internal Revenue Code, [2] increased deficiencies against all of the petitioners in the event this Court should decide that the share of any of the petitioners was greater than the amount determined by him in the deficiency notice. Petitioners argue that the term "claim" used in the *150 statute implies an issue; that an issue can be created only by an affirmative allegation with an expressed or implied denial thereof; and that the assertion injects a new theory into the case, for the meeting of which no opportunity has been afforded. There is no ground here for claiming surprise or the introduction of a new issue in the case. The Goodman group did not contest the profits of the Wagner Co. and the question, in general, was whether the enterprise should be recognized for tax purposes. The trial extended throughout a period of about four days during which considerable testimony and documentary evidence were submitted by the parties to show the true status of Wagner Co. Evidence directed to whether or not the wives should be recognized as partners was broad enough to establish who, in fact, earned the income, which the respondent seeks to tax to the proper individual. See Helvering v. Taylor, 293 U.S. 507. This particular problem does not involve the petitioner Wagner. At the outset of the hearing counsel for the Goodmans and Jacoby and counsel for respondent, in effect, each stated that the matter, except as to Wagner, involved merely the allocation of *151 the income of Wagner Co. between the parties and their wives or husbands. Broadly stated, no new issue is involved, for the prime question here is the distribution of the income of Wagner Co. After the assertion of increased deficiency was made by the respondent, the petitioner Goodman was permitted, even after resting, to adduce further evidence and did put on evidence relative to allocation of the income and as to Doris Goodman Jacoby, and no contention is made that additional evidence could be submitted to establish that Charles Goodman is not taxable on the profits credited to Doris. The assertion of increased deficiencies was made dependent upon the ultimate conclusion reached by us. Our conclusions rest upon findings based upon facts to which there was no objection. Though motion to amend pleadings in conformity to proof was denied, our conclusions upon the whole record form, in our opinion, sufficient basis for the assertion of increased deficiency against Charles Goodman because of attribution to him of income earlier attributed to Jacoby. A similar situation prevailed in Commissioner v. Ray, 88 Fed. (2d) 891. There, the Board held that the amount of a certain *152 note was income in 1928 when paid and not in 1926 as the Commissioner had determined. After the Board had made its finding the Commissioner filed a motion for a rehearing for the purpose of abandoning his claim that the amount of the note was income in 1926 and including it in a deficiency for 1928. The court, in holding that the motion should have been granted, pointed out that the Commissioner was "within his rights in correcting the claim to conform to the findings of the Board," that there was "no new or different claim," and that inclusion of the amount in income for 1928 was a mere matter of computation under the rules of the Board. There is no material difference in the situation here. Distinguishable facts requiring a different answer prevailed in cases cited by the petitioner as controlling. In Helvering v. Edison Securities Corporation, 78 Fed. (2d) 85, the Board reached a conclusion on a material point neither party had contested. In Commissioner v. Sussman, 102 Fed. (2d) 919, the claim made by the Commissioner involved a new issue. The same situation prevailed in Commissioner v. Erie Forge Co., 167 Fed. (2d) 71. The assertion *153 of the Commissioner here constitutes, in our opinion, a claim within the meaning of the statute. Accordingly, under Rule 50 the profits of Wagner Co. reported by Doris for the period after November 23, 1943, will be included in the income of Charles Goodman. The legal fees, cost of photostats and fees for filing petitions, all in connection with the case of Charles Goodman et al., supra, are being claimed as non-business expenses under section 23(a)(2) of the Internal Revenue Code. In Charles Goodman et al., supra, we held that the deficiency each year, except in 1930, was due in part to fraud with intent to evade tax. Respondent argues that the holdings preclude the allowance of the expenses incurred in contesting the liabilities. The statute does not expressly make the deduction depend upon the lawful or unlawful character of the expenses. Commissioner v. Heininger, 320 U.S. 467, in which the Court allowed as ordinary and necessary business expenses legal expenses incurred in an unsuccessful effort to set aside an order of the Postmaster General against *154 the use of the mails for fraudulent purposes. After Bingham's Trust v. Commissioner, 325 U.S. 365, we allowed as an ordinary and necessary business expense attorneys' and accountants' fees incurred in a compromise of income tax deficiencies and penalties, including any criminal liability incident thereto, Greene Motor Co., 5 T.C. 314, and as non-business expenses, under the statute applicable here, legal fees paid in litigation for a refund of income taxes, Howard E. Cammack, 5 T.C. 467, and legal fees and other expenses paid in contesting deficiencies in income taxes before the Board. Herbert Marshall, 5 T.C. 1032. See also James A. Connelly, 6 T.C. 744; David L. Loew, 7 T.C. 363; Pelham G. Wodehouse, 8 T.C. 637. In Longhorn Portland Cement Co., 3 T.C. 310, we allowed as ordinary and necessary business expense deductions legal expenses incurred in compromising an action brought by a state to recover penalties for violation of its anti-trust statute. That decision and Greene Motor Co., supra, *155 were relied upon by the Chief Counsel in an opinion holding that attorneys' fees paid in defense of a suit brought under a Federal statute for violation of regulations establishing ceiling prices were deductible as ordinary and necessary business expenses. G.C.M. 24810, C.B. 1946-1, p. 55. At about the same time the regulations of the Commissioner were amended to provide that "Expenses paid or incurred by an individual in the determination of liability for taxes upon his income are deductible." C.B. 1946-1, p. 61. This provision, like the statute, is general in its terms and does not expressly exclude expenses paid or incurred in contesting fraud penalties. In the Heininger case the Court said that "It has never been thought, however, that the mere fact that an expenditure bears a remote relation to an illegal act makes it non-deductible" and that if the deduction was to be denied "it must be because allowance of the deduction would frustrate the sharply defined policies" of the statute under which the Postmaster General issued the fraud orders. Here, the expenses were not paid in connection with litigation involving a criminal action. The act of Goodman in filing *156 false returns with intent to evade income taxes resulted in the imposition of civil penalties which, like the statute involved by the Postmaster General against Heininger, are not "personal punishment on violators," Commissioner v. Heininger, supra, instead are "provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud," Helvering v. Mitchell, 303 U.S. 391, and are required to be assessed, collected and paid as tax. Section 293, Internal Revenue Code. The fraud committed might have formed the basis for a charge of criminal liability but nothing here suggests that such action was ever taken; hence, the expenses in question were not connected in any way with criminal action. Allowance of the deductions here under the circumstances would not interfere with the administration of the penal provision under which the Commissioner acted. Further discussion appears unnecessary. We are of the opinion that the expenses are allowable within the rationale of the Greene Motor Co. and Heininger cases, and so hold. *157 Deduction of the payments made by Charles Goodman in 1943 and 1944 in connection with the recovery of bonds of the Hamilton Gas Co. is being resisted by the respondent upon the ground that the amounts are in the nature of capital expenditures. The primary object of the suit was to determine a reasonable charge for the services of the bondholders' committee. Litigation was compromised and, upon payment of the amount agreed upon, Goodman received his securities. Under the circumstances the amount should not be treated as a capital expenditure. The amounts were paid in connection with the production of income and are deductible under the provisions of section 23 (a) (2), Internal Revenue Code. Charles Goodman was an engineer by profession and was engaged in engineering during the taxable years. The payments of $5.00, $1.75, and $43.43 were incurred in the practice of his profession and are deductible under the provisions of section 23 (a) (2). The occupancy tax paid to the city of New York in the amount of $1.00 is deductible under the provisions of section 23 (c) (1), Internal Revenue Code. Petitioner Henry J. Jacoby is claiming the *158 amount of $795.24 as a deduction in 1944 for medical expenses. Section 23 (x), Internal Revenue Code, authorizes deductions for expenses paid for medical care "not compensated for by insurance or otherwise." There is proof here of payments totaling $1,432.87 for medical care but no proof was made and it is not claimed that Jacoby did not obtain reimbursement in whole or in part by insurance or otherwise. Under the circumstances we have no facts to justify allowance of a deduction for any amount. Petitioner Wagner, admitting his liability for profits of Wagner Co. which were reported by his wife, contends on brief that he received from the business in 1943 not in excess of the amount of $13,000, constituting salary for the year 1943, and long-term capital gain of $6,533.42, or not in excess of $7,189.91. He argues that Wagner Co. had no distributable profits in 1943, alleging that the books do not contain an accrual of $92,000 for back charges asserted by the Navy Department and erroneously included the amount of $134,226.60 as retainage and that no income should have been reported on the 6-crane and 10-crane contracts in view of the fact that the Navy Department *159 did not accept them until 1944 and 1945. The contentions are made in the alternative with leave to the Court to select the correct one. He also argues that, assuming that the books properly reflect the income of Wagner Co., the partners by the agreement of November 23, 1943, fixed his distributive share as the amount actually received by him, and that any amount of profits in excess of $13,000 constituted payment to his partners to relieve himself of liability for obligations of Wagner Co. In Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, the Court said that "* * * It has long been held that, in order truly to reflect the income of a given year, all the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. * * *" The same Court in Security Flour Mills Co. v. Commissioner, 321 U.S. 281, said that "It is settled by many decisions that a taxpayer may not accrue an expense *160 the amount of which is unsettled or the liability for which is contingent, and this principle is fully applicable to a tax, liability for which the taxpayer denies, and payment whereof he is contesting. * * *" The argument made with respect to the accrual of $92,000 for back charges of the Navy Department is based upon the theory that Wagner Co. had agreed that the charges to that extent were valid. The proof here is no more than that petitioner Wagner and Charles Goodman estimated that the back charges under the 6-crane and 10-crane contracts would be that amount. The evidence does not establish that any claims for back charges were recognized by Wagner Co. at any time prior to November 23, 1943. The nearest Wagner Co. ever got to admitting liability was to recognize one complaint as serious and, as to it, the evidence does not show what expenditure of money would be necessary to satisfy the demand if it ever agreed to comply with it. All of the claims made for back charges under the two contracts were eventually satisfied for about $20,000. Under the circumstances there was no liability to accrue on November 23, 1943, with respect to the back charges in question. *161 Section 41, Internal Revenue Code, provides that "The net income shall be computed upon the basis of the taxpayer's annual accounting period * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; * * *" The consistent practice of Wagner Co. was to bill the Navy Department for 90 per centum of the work performed and material supplied for various parts necessary for the construction of the cranes, including amounts for supervision, engineering and overhead. The requests were made on forms designated as "Progress Monthly Payments 90% of Contract Price" and were made at intervals of about one month. Each request for payment was supported by receipted bills. The amount of each statement, plus retainage of 10 per centum, was charged to the Navy Department in an account receivable and a credit was made in an account maintained for the appropriate contract. At the close of each taxable year the accounts kept for the contracts were closed into the profit and loss account. In that manner the retainage was reflected in the profit reported by Wagner Co. each year. The *162 unpaid retainage on November 23, 1943, was $134,226.60 but of that amount $10,486.74 was accrued on the books in 1942 and is reflected in the profits computed by Wagner Co. for that year. Petitioner Wagner is not questioning the accuracy of the profit reported by the business in 1942. A similar situation prevailed in Rosa Orino 34 B.T.A. 726. In that case the taxpayer in 1931 was carrying out five contracts which he had entered into with the Bureau of Public Roads and entered in his books, pursuant to his custom in former years, not only the cash received from the United States Government under the contracts but also accrued the remainder which the Government was withholding under provisions of the contracts authorizing it to retain 10 per centum of the estimated amount until final completion and acceptance of all the work covered by the contract. We held that under the percentage of completion method of reporting income, which method Wagner Co. used prior to, during and subsequent to the year 1943, "the full percentage is to be returned in any particular year even through the actual payment of a balance due is not made until a later year." Wagner Co. not only adopted *163 and consistently used the percentage of completion method of returning income but also the Commissioner accepted the accounting practice as procedure clearly reflecting income. His determination is presumed to be correct and should not be disturbed without proof that it is wrong. To adopt petitioner Wagner's contention would be to distort income rather than clearly reflect it over the years during which the contracts were being carried out. The fact that during the year 1943 there was apprehension that back charges would be made by the Navy Department does not change the result. We have determined that no amount was accruable on account of such charges. If the threatened back charges had ripened into a liability subject to accrual for tax purposes, the amount would have been an expense in carrying out the contract and would not have affected the liability of the Government to pay the amount agreed upon for the construction of the cranes. Had Wagner Co. refused to make good the alleged defects, the Navy Department could have corrected the defects and offset the cost thereof against the retainage. *164 The retainage was a form of collateral or security for the faithful performance of the contracts and did not affect the amount earned by Wagner Co. thereunder. The respondent clearly was right in including the retainage in the income of Wagner Co. Petitioner Wagner asserts, in effect, that he having dealt with his partners in an arm's length transaction, there was no authority to tax him on undistributed profits which his partners received and that the substance of the issue is whether he should be liable for tax on profits received by the Goodman group. Wagner, acting with advice of counsel, was responsible for the position in which he now finds himself. Whether the deal with his partners was or was not a good one for him is not material to the issue. Our duty here is to apply the law to the facts as we find them, and if the result subjects Wagner to greater tax liability than he anticipated when entering into the transaction, it is no more than the consequence of his own choice of action. Wagner Co. was required to make a return and report therein the distributive share of each partner. Section 187, Internal Revenue Code. Section 182 required Wagner *165 to include in his gross income for 1943 his distributive share of the profits of the enterprise until he retired as a partner even though not received. That he had knowledge of the statutory requirement is evident from the fact that he included in his return for 1942 his share of the gain for that year without any withdrawals. The sale of the shares outstanding in his and his wife's name did not relieve him of the liability to report as ordinary income their distributive shares of the profits of the business since the last accounting period. Guaranty Trust Co. v. Commissioner, 303 U.S. 493; Le Sage v. Commissioner, 173 Fed. (2d) 826; Louis Karsch, 8 T.C. 1327; Standard Paving Co., 13 T.C. 425, 440. Petitioner Wagner asserts that he waived a part of the alleged profit of Wagner Co. as a result of the agreement he received to be relieved of liability for obligations of the business and that the "payment constitutes a proper business deduction." The pleadings do not raise an issue on the question. Assuming the deductibility of the amount is properly before us, we find no merit in the claim. No payment was actually made and if *166 the parties placed any value on the indemnification, it is reflected in the consideration paid for the interest sold. No method is suggested to arrive at the amount of the consideration paid giving rise to the alleged deduction or an estimation thereof. Aside from these considerations, in Merrill v. Commissioner, 173 Fed. (2d) 310, the court held that an amount actually paid by a partner to the firm for his share of partnership liability in exchange for an agreement of his partners to hold himself harmless against claims of creditors of the business did not result in a loss from the operation of the business. Concerning the $13,000 respondent included in petitioner's income as salary from Wagner Co., Wagner contends not only that the amount was intended as a payment against profits, and not in addition, but also that it was the only amount that he had a right to receive as profits. The argument is based on the provision that no provision was made for payment of salary until November 23, 1943, when it is alleged the original articles of copartnership were modified in that respect and that there was no accrual of the salary as of November 23, 1943. The original agreement *167 provided for the deduction of salaries in computing net profits of the business. No salaries were paid to partners prior to November 23, 1943, but the provision, in the absence of any proof showing a contrary intent, is broad enough to cover salaries to partners in addition to their specified shares of the net profits after salaries. To sustain petitioner Wagner, it would be necessary to conclude from all of the facts that the effect of the agreement of November 23, 1943, which was not signed by all of the individuals recited in the original agreement as partners, was to eliminate Wagner as a partner as of the first of that year. The Goodman group did not so construe the agreement and petitioner Wagner when preparing his return for 1943 did not have such an understanding, as will be shown in our discussion of the next issue. Wagner sold his and his wife's share of Wagner Co. which obviously included his interest in the profits of the business up to that time and in addition, pursuant to terms of an agreement not signed by all of the alleged partners, became entitled to receive thereafter in 1943 and was paid by Wagner Co. salary in the amount of $13,000 for services performed in *168 1943. If, as petitioner Wagner contends, he had no right to salary prior thereto, the amount was for services to be performed thereafter in 1943. Wagner Co. charged the amount to expense in carrying out the 6-crane contract and took it into account in arriving at the net profits prior to November 23. Whether paid as salary or as a distribution of profits, the amount constitutes ordinary income to the recipient. See Estate of S. U. Tilton, et al., 8 B.T.A. 914; Karl Pauli, 11 B.T.A. 784; W. W. Martin, 12 B.T.A. 1385; Augustine M. Lloyd, 15 B.T.A. 82. Petitioner Wagner contends that long-term capital gain of $6,533.42, or not in excess of $7,189.41, was realized upon the sale of the partnership interest in 1943. The latter figure was computed by not taking into account the interest outstanding in the name of his wife. We understand the concession made by petitioner at the hearing to include any amount of gain realized from the sale of the interest of his wife. Notwithstanding the contention being made as to the amount of the gain, petitioner appears to realize the effect of his concession for at one point in his brief he asserts *169 his contention to be that "he enjoyed a capital gain of $6,533.42 on the sale of his and his wife's interest in the partnership." Accordingly, we will confine our discussion on the issue to the lesser figure. In his return for 1943, Wagner reported $28,384.40 as ordinary income from Wagner Co. On brief, Wagner alleges that the amount consisted of compensation in the amount of $13,000, gross proceeds of the sale of his partnership interest amounting to $7,500, and withdrawals in 1943 in the amount of $7,884.30 on profits reported in 1942. The evidence here is that the amount was arrived at by an entirely different method. The return shows that the amount of $28,384.40 was arrived at by deducting from $29,134.40, an amount used to represent his gross income from Wagner Co., the amount of $750 for his investment in the business. Other facts show that the amount takes into account the amounts actually received from Wagner Co. and the sale. The withdrawals of Wagner in 1943 and the amount received from Charles and Robert Goodman totaled $31,134.40, which is exactly $2,000 more than the gross amount reported as income. No long-term gain was reported by Wagner in his return. The parties *170 do not disagree on the amount of the selling price of the partnership interest. Petitioner uses a cost basis of $6,966.58. The amount was arrived at by subtracting from the original capital contributions of $3,000, plus undistributed profits in 1942 in the amount of $17,000.98, the amount of $13,034.40 for withdrawals in 1943. The respondent used the same figures, except that in addition thereto he included their share of the undistributed profits in 1943 in the amount of $48,751.06. Whether or not the basis should include Wagner's distribution share of the profits in 1943, amounting to $48,751.06, is the real difference between the parties. The amount in question constitutes a part of the cost of the asset sold. Warren E. Brown, 4 B.T.A. 56; T. B. Noble, 12 B.T.A. 1419; Zolton V. Morvay, 19 B.T.A. 928. Accordingly, on this issue we sustain the respondent. Decisions will be entered for the respondent in Docket Nos. 14239, 18173 and 20467, and under Rule 50 in the remaining proceedings. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Robert Goodman (Dockets 14239, 18173), Henry J. Jacoby (Dockets 14240, 18175), and George P. Wagner (Docket 20467).↩
1. Doris reported 383 shares at same cost. ↩
2. Doris reported cost of $1,986.50.↩
1. $104,867.37 was actually entered in books in 1942. ↩
2. $527,328.63 was actually entered in books in 1943.↩
1. Credit balancing entries were made as of Dec. 31, 1943, in capital accounts as follows:↩
1. $8,384.40 prior to Nov. 23, 1943. ↩
2. $5,484.40 prior to Nov. 23, 1943.↩
1. Of the amount, $1,200 was paid prior to Nov. 23, 1943. ↩
2. Charles Goodman paid rent on apartment. ↩
3. Loan to Wagner Co. Repaid in 1944.↩
1. Of the amount, $1,200 was paid prior to Nov. 23, 1943. ↩
2. Paid out of joint checking account with husband. ↩
3. To husband for purchase of interest in Wagner Co. ↩
4. $1,400 of loan of $5,000 paid same year.↩
1. Includes amount reported by his wife. ↩
2. Includes amount reported by his wife and Doris G. Jacoby. ↩
3. Includes amount reported by his wife and Doris G. Jacoby, except $896.20 of latter for period after Nov. 23. ↩
4. Includes $896.20 of wife after Nov. 23.↩
2. SEC. 272(e)↩. Increase of Deficiency After Notice Mailed. - The Board shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, notice of which has been mailed to the taxpayer, and to determine whether any penalty, additional amount or addition to the tax should be assessed - if claim therefor is asserted by the Commissioner at or before the hearing or a rehearing.